## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 22 2020, 10:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Flora
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights:

S.S. (Minor Child),

And

L.N. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

July 22, 2020

Court of Appeals Case No. 20A-JT-220

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

The Honorable Sherry A. Hartzler, Magistrate

Trial Court Cause No. 02D08-1904-JT-205

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, A.L.N. (Mother), appeals the trial court's termination of her parental rights to the minor child, S.S. (Child).

We affirm.

# ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Department of Child Services (DCS) presented sufficient evidence to support its petition to terminate the parent-child relationship.

# FACTS AND PROCEDURAL HISTORY

Mother is the biological parent to Child, born on February 13, 2006. On April 26, 2016, DCS filed a Child in Need of Services (CHINS) petition, alleging that Mother had failed to properly supervise Child, Mother tested positive for cocaine and synthetic cannabinoids while Child was in her care, Mother permitted homeless people to use drugs in her home, and Mother failed to ensure that Child regularly attended school. On May 18, 2016, after Mother admitted to the allegations, the trial court granted DCS's petition and adjudicated Child to be a CHINS. On June 27, 2016, the trial court ordered Mother to participate in services, including, submitting to assessments for behavioral health and drug/alcohol, taking medications as prescribed, engaging in homebased services, engaging in counseling, obtaining and maintaining employment, attending supervised visits with the Child, and participating in random drug screens.

[5]     On October 4, 2016, the trial court determined that Mother had failed to satisfactorily participate in the court-ordered services and changed her supervised visitation to be "therapeutic in nature." (Tr. Exh. p. 30). On October 31, 2016, Mother was charged with maintaining a common nuisance as a Level 6 felony, to which she pled guilty on January 9, 2017. She received a suspended sentence of one year and 183-days. On April 10, 2017, the trial court determined that Mother had not yet fully complied with the dispositional services, had not remained in contact with DCS, and had not participated in therapy. The trial court found that Mother had "not demonstrated an ability to benefit from services." (Tr. Exh. p. 45). In March and August 2017, Mother was found in violation of the terms of her probation and sentenced to the Department of Correction on November 22, 2017. Mother was released on July 9, 2018, after violating the terms of her work release.

[6]     By September 19, 2018, Mother tested positive for illegal substances and had failed to satisfactorily participate in court-ordered services and programs. On November 19 and 20, 2018, the trial court conducted a fact-finding hearing during which it denied DCS's termination petition, finding, in pertinent part, that Mother had recently demonstrated a willingness to provide for Child and Mother had positively started to engage in services. Yet by April 8, 2019, Mother again failed to participate in therapy, submit to random drug screens, was unemployed, and had visited the Child while under the influence of drugs and alcohol. Accordingly, DCS filed a second petition to terminate Mother's parental rights.

[7]     On four non-consecutive days in September 2019, the trial court conducted factfinding hearings on the DCS's petition to terminate Mother's parental rights to Child. During these proceedings, the trial court received extensive testimony from David Lombard, Ph.D. (Dr. Lombard), a forensic psychologist. On May 24, 2016, Dr. Lombard performed a psychological assessment of Mother. At the time, Mother was unemployed and living with her mother, who paid for all of Mother's expenses. Dr. Lombard observed that Mother had "long episodes of mania and depressions[.] Her ability to concentrate is poor. She is easily distracted. She had racing thoughts and tangential thinking during her appointment." (Tr. Exh. p. 126). Mother admitted to using marijuana when she was fourteen years old and confirmed that she had used marijuana within a month of her appointment with Dr. Lombard. She used "various narcotics over the years to help take the edge off[.]" (Tr. Exh. p. 126). Mother informed Dr. Lombard that the Child was on the autism spectrum, had intermittent explosive disorder, and ADHD. Although Child was on medication, Mother, on her own, "had been attempting to decrease his medications at that time to a point where he was not being overmedicated." (Tr. Exh. p. 126). Dr. Lombard opined that Mother should receive "comprehensive medication management to treat her bipolar disorder and generalized anxiety disorder symptoms." (Tr. Exh. p. 128). Because of her history of marijuana and synthetic marijuana use, he also recommended at least six months of substance abuse treatment.

[8]     On July 19, 2016, Mother returned to Dr. Lombard's office for complete psychological testing. She reported feeling overwhelmed, with "very high stress

levels" which prevented her from taking "care of her activities of daily living." (Tr. Exh. p. 134). While Mother reported she was on medication, her "long term pattern of mood disorder symptoms" indicated to Dr. Lombard that Mother's medication was not controlling her condition. He recommended comprehensive medication management to "control her bipolar disorder and PTSD symptoms." (Tr. Exh. p. 137). Mother showed delusional thought patterns. Her drug history indicated that "she is highly likely to continue using," and needed to engage in a complete substance abuse treatment for at least six months. Dr. Lombard also recommended that Mother address her personality disorder through dialectical behavior therapy." (Tr. Exh. p. 137). Dr. Lombard concluded, "overall, the current assessment indicated that [Mother] is high risk for abuse and neglect of children because of her severe mental health conditions and addiction issues." (Tr. Exh. p. 137).

[9] Following Dr. Lombard's diagnoses, Mother was referred to medication management at Bowen Center, but she failed to follow through with this referral. In March 2019, a month prior to DCS filing its termination petition, Mother returned to Bowen Center. At that time, Mother worked with mental health counselor Mukhabbat Yusupova (Dr. Yusupova) on substance abuse and individual therapy. Dr. Yusupova testified that Mother completed the therapy and had benefitted from it. Although Mother tested positive through DCS screens on four different occasions from March until July 2019, Dr. Yusupova was unaware of Mother's positive test results. "Given Mother's continued use

and her dishonesty in therapy," Dr. Yusupova opined that her level of therapy would have to be reassessed. (Transcript Vol. II, pp. 165-66).

[10] During the termination proceeding, evidence was received that Mother had been consistently attending visitation with the Child since November 2018. Despite her attendance, Mother struggled with maintaining appropriate behavior and boundaries. Mother was often unable to appropriately respond to Child's behavioral issues during visits, instead resorting to yelling and swearing at the Child. Even when Mother was provided instruction, she resorted to the same behavior.

[11] After DCS filed its termination petition, Mother started to participate in home-based services in May 2019. Although Mother's goals were to obtain housing, employment, and transportation, she was not compliant. Mother's housing remained unstable, and since her dismissal from work release in July 2018, she had been living "on and off with her sister" in a two-bedroom home. (Tr. Vol. II, p. 188). Mother's sister had been an alcoholic for twenty years, and even though Mother insisted that her sister was currently sober, DCS case managers observed persons under the influence in the home.

[12] Child has been with the same foster family since June 2016. He was diagnosed with "high functioning Asperger's syndrome, for which he initially displayed behaviors such as hitting himself and hitting himself on a glass table, running away, and having behavioral issues at school." (Appellant's App. Vol. II, p. 18). Since then, his behavior issues have undergone a marked improvement

and he has "an Individual Education Plan" at school, which Mother stopped participating in after November 2018. (Appellant's App. Vol. II, p. 18).

[13] Bowen Center started working with Mother and Child even prior to DCS's involvement. Based on observations, concerns remained that "Mother would not be able to handle [Child's] behaviors, as she has historically not followed through with the recommendations of Bowen Center to assist her." (Appellant's App. Vol. II, pp. 18-19). DCS's family case manager (FCM) testified that Mother ceased engaging in services in November 2018 after DCS's failed first termination petition, and she only re-engaged in services in March 2019, a month prior to DCS's second termination petition. Even then, Mother generally refused to engage in drug screens, and only occasionally agreed to submit to testing. Despite the limited testing, Mother still tested positive for marijuana in March and June 2019, and for cocaine in May 2019.

[14] Evidence was received that Child had been removed from Mother's care for more than forty months at the time of the termination proceeding. FCM testified that Child has autism and needs stability, and therefore "it would be harmful to place him with Mom, because there doesn't seem to be any stability, no transportation, no stable employment and housing[.]" (Appellant's App. Vol. II, p. 22). FCM advised that Mother cannot take care of "an autistic child" because she "is really struggling to take care of herself." (Appellant's App. Vol. II, p. 22). The Child's Guardian ad Litem (GAL) opined that termination would be in the Child's best interest because of Mother's failure to

successfully complete treatment and obtain sobriety, and her refusal to regularly submit to drug screens.

[15] On December 30, 2019, the trial court entered its Order terminating Mother's parental rights to the Child, concluding in pertinent part:

> 48. [] By the clear and convincing evidence, the [c]ourt determines that there is a reasonable probability that the reasons that brought about the Child's placement outside the home will not be remedied.

> 49. The court concludes that the reason for the Child's placement outside of Mother's home was due to her drug use, her failure to benefit from services, and her unwillingness to appropriately address her mental health.

> 50. The court concludes that not only does Mother have her own issues with mental health and stability, so does the Child in this matter. The [c]ourt concludes that [Child] is a special needs young man who requires stability and consistency to assist him in obtaining the proper therapy and managing his own behaviors. The court concludes that, although the Child requires consistency and stability, Mother has been unable and unwilling to demonstrate an ability to provide this need to the Child, Mother has demonstrated with particularity, that she is unable to provide appropriate care for her Child, given that she has knowingly resided with an individual who has been an addict for twenty years, and that she engaged in an abusive relationship. Of particular concern is Mother's own complete lack of insight into her mental health needs and her dishonesty in therapy as to her continued use of illegal substances.

> 51. [] In this case the [GAL] and CASA have concluded that termination of parental rights is in the [Child's] best interests.

> The court concludes that the termination of parental rights and the plan for care and treatment for adoption will provide the Child with the nurturing care and protection he requires. It is therefore in the [Child's] best interests that the petition to terminate parental rights be granted.

(Appellant's App. Vol II, pp. 56-57).

[16] Mother now appeals. Additional facts will be provided if necessary.

## DISCUSSION AND DECISION

[17] Mother challenges the trial court's termination of her parental rights to her Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child*

*Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (quoting *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006)).

[18] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

### I. *Termination of Parental Rights Statute*

[19] In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to be highly probable." *Id.*

[20] It is well-established that "[a] trial court must judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied*. In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment. *McBride v. Monroe Co. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's failure to respond to services. *Lang v. Starke Co. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait

until the child[] [is] irreversibly influenced by [its] deficient lifestyle such that [its] physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id.* Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[21] Mother's argument focuses on Dr. Yusupova's testimony, who noted that if Mother were to restart services, she would not have to start again from the beginning, as an indication that Mother's situation and mental health was improving. Mother's argument is misplaced. In March 2019, a month prior to the DCS filing its termination petition, Mother returned to the Bowen Center, where she started working with Dr. Yusupova on substance abuse and individual therapy. Although we agree with Mother that Dr. Yusupova testified that Mother completed the therapy and had benefitted from it, Dr. Yusupova was unaware of Mother's four positive drug screens. When confronted with this evidence, Dr. Yusupova opined that Mother's level of therapy would have to be reassessed "[g]iven [her] continued use and her dishonesty in therapy." (Tr. Vol. II, pp. 165-66).

[22] The evidence further reflects that in May 2016, Dr. Lombard advised that Mother should receive "comprehensive medication management to treat her bipolar disorder and generalized anxiety disorder symptoms." (Tr. Exh. p.

128). Because of her history of marijuana and synthetic marijuana use, he also recommended at least six months of substance abuse treatment. Mother did not follow these recommendations. Only when DCS filed its petition to terminate in April 2019 did Mother return to the Bowen Center and started participating in home-based services. Although Mother's goals were to obtain housing, employment, and transportation, she was not compliant. Mother's housing remained unstable, and since her dismissal from work release in July 2018, she had been living with her sister who had been an alcoholic for twenty years. Mother generally refused to engage in drug screens. When she did submit to a screen, Mother tested positive for marijuana in March and June 2019, and for cocaine in May 2019.

[23] Even though Mother had been consistently attending visitation with the Child since November 2018, Mother continued to struggle with maintaining appropriate behavior and boundaries even after having been given guidelines. Mother was often unable to appropriately respond to Child's behavioral issues during visits, instead resorting to yelling and swearing at the Child.

[24] "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Mindful of this guideline, we note that the evidence presented clearly and convincingly shows that a reasonable probability exists that the conditions that led to the Child's removal from Mother's care will not be remedied. At no point during the proceedings did Mother exhibit a turnaround in her behavior or commence

participation in DCS's services. After being offered three years of reunification services, Mother did not improve her parenting skills. When the trial court granted Mother another chance in November 2018 by denying DCS's first termination petition, Mother responded by ceasing to engage in services until March 2019, a month prior to DCS's current termination petition being filed. A parent's habitual unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the removal conditions will not change. *In re G.M.*, 71 N.E.3d 898, 908 (Ind. Ct. App. 2017). Accordingly, the trial court was entitled to weigh the evidence as it found appropriate in the context of this case, and we conclude that the trial court's findings support the judgment.

## II. *Best Interests of the Child*

[25] Mother also challenges the trial court's conclusion that termination is in the Child's best interest. To determine whether termination is in a child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. The court must subordinate the interests of the parents to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id*. We have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interest. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

[26] Child has been with the same foster family since June 2016. He was diagnosed with "high functioning Asperger's syndrome, for which he initially displayed behaviors such as hitting himself and hitting himself on a glass table, running away, and having behavioral issues at school." (Appellant's App. Vol. II, p. 18). The evidence supports that this behavior has improved since he started living with his foster family. Based on observations at the Bowen Center where both Mother and Child received therapy, concerns remained that "Mother would not be able to handle [Child's] behaviors, as she has historically not followed through with the recommendations of Bowen Center to assist her." (Appellant's App. Vol. II, pp. 18-19). FCM testified that Child has autism and needs stability, and therefore "it would be harmful to place him with Mom, because there doesn't seem to be any stability, no transportation, no stable employment and housing[.]" (Appellant's App. Vol. II, p. 22). FCM advised that Mother cannot take care of "an autistic child" because she "is really struggling to take care of herself." (Appellant's App. Vol. II, p. 22). The Child's GAL opined that termination would be in the Child's best interest because of Mother's failure to successfully complete treatment and obtain sobriety, and her refusal to regularly submit to drug screens.

[27] Here, Mother failed to avail herself of the opportunities and services offered by DCS to reunite with the Child and made no progress nor commitment during the proceedings of the case. "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification." *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014). Even though "the ultimate purpose of the law is to

protect the child, the parent-child relationship will give way when it is no longer in the child's interest to maintain this relationship." *In re B.D.J.*, 728 N.E.2d 195, 200 (Ind. Ct. App. 2000). Mother's historical inability to provide a suitable environment for the Child, together with her current inability to do the same, supports the trial court's conclusion that termination of her parental rights is in the best interests of the Child. Accordingly, we affirm the trial court's decision.

## CONCLUSION

[28] Based on the foregoing, we conclude that DCS presented sufficient evidence to support the trial court's Order terminating Mother's parental rights to the Child.

[29] Affirmed.

[30] Mathias, J. and Tavitas, J. concur